Good morning, Your Honors, Counsel. May it please the Court. My name is Michael Soshnick. I'm the attorney for the appellant, Elliot Daniloff, and I'm here to ask you to please vacate the judgments of the District Court resulting in findings of fraudulent inducement and breach of contract resulting in awards to Bloomfield Investment Resources Corp. of $1 million in punitive damages, $18.5 million in compensatory damages, and pre-judgment interest of an additional approximate sum of $15 million. Let me just tell you, set aside the punitive damages issue for a moment. As I understand it, Judge Marrero had a trial. Yes, there was a four-day trial, Your Honor. One side, effectively, I'm dumbing down a little bit, was credible, and the other side was not credible, in describing the series of deals and transactions and also the emails and their characterizations of the backdrop of those emails. Is that right? Yes, that's right, Your Honor. But I think you should – It would be helpful for me to tell me why the credibility determinations that really run through all these factual findings and then, ineluctably, bleed into the conclusions of law are wrong. Why there's no – he had no basis in the record to make that determination. Yes, of course, Your Honor. It's a very good question. First of all, footnote number one on page seven of the district court's decision recognized that both parties referred to their transaction as an investment in various emails. And I'm going to get to the breach of contract point in just a moment. But first, I want to make very clear that this circuit has consistently held that when the same core events, relationship, or transaction in a case grounded in fraudulent inducement and breach of contract is brought, the fraudulent inducement count must be dismissed because they are duplicative. And that's with respect to the same core events, relationship, or transaction. In this case, irrespective of any credibility findings, Your Honor, we have the same core events, the same relationship, and the same transaction. A lot of that depends on whether there is evidence of, you know, statements of present facts that are corollary to the agreement. You could have a fraudulent – you could have a claim for fraudulent inducement or a party that says I was fraudulently induced into this contract and even if it's a valid contract, it was breached, right? Those could be two separate questions. Your Honor. So I get that sometimes the fraudulent inducement might be a promise of performance, in which case it really is duplicative of the breach of contract. But sometimes it's not. So the district court here said that it was not, right? That there was an inducement as well as a breach. The district court erred. And I want to be very clear about this. There was no misrepresentation of any present fact in this case. And Bloomfield Investment Resources Corp. is really two brothers, the Rubin brothers. These are fantastically wealthy people. They're worth about $15 billion. They have invested extensively in Russia. They've done many, many deals there. They know the climate. They know the people. They know the terrain. And they know that a lot of money can be made. But in this case, my client went out of his way in the subscription agreement, a 133-page subscription agreement, to make it clear this is a high-risk investment. You could lose most or all of your money. My client did not make a material contract. So I'm just going to go back to the first question, which is,  And you have the opportunity to add as to whether the subscription agreement was the contract, which is not what the district court said. But I guess I have a more basic question, which is, I understand you have an argument for why there wasn't a fraudulent inducement. And also, there wasn't a breach because the operative contract should have been the subscription agreement. You're correct, Your Honor. At least that's your argument. But if you lose on either one of those, the damages are the same, right? But there isn't a double recovery if the measure of damages is the losses from the contract, regardless of whether it's because of a breach or because of a fraudulent inducement, right? Your Honor, just on fundamental principles of fairness and reasonableness, the fraudulent inducement claim has to go. This million dollars punitive damages has to go. No, but I guess my question is, like, let's say that the fraudulent inducement account were vacated, but the breach of contract was still there. Wouldn't the damages be the same? Well, they would be $1 million less. Okay. And I think that the Court should recognize that the district court decided to hear testimony and make credibility findings with respect to testimony because it ignored basic contract law. We had a very clear – But on the fraudulent inducement, isn't it the district court's – wasn't it the district court's determination that your client misrepresented that the money had to go into the investment fund in order to disguise it as equity, which is separate and apart from the – whether he's going to repay the loan agreement, when, in fact, it went through into that fund so he could obtain exclusive control over it and then disperse it? Why isn't that separate and collateral from the agreement itself? So, first of all, Your Honor, and that's a very good question, I must point out to you that the plaintiff, Bloomfield Investment Resources Corp., David Rubin, claimed that the subscription agreement was not the contract. That there was an oral contract. I get that. But I'm so angry about this, and I have such limited time, because the district court decided to hear parole evidence on whether Mr. Rubin intended to be bound by a clear and unambiguous contract citing the Saulstein case. And the Saulstein case – This was a trial. I mean, this was a trial. Yes, it's a trial. You can hear that evidence. I'm sorry? You can hear that evidence. I mean, you can hear the evidence. This is exactly why you wanted a trial. You got a trial. But the Saulstein case spoke to a promissory note that was unsigned and not delivered. I get that it's odd that you have a written agreement, and the determination is that that's not the real contract, there's an oral contract separately. It's odd, but you wouldn't say it's impossible, right? Your Honor, I – So you're saying the evidence doesn't support that here, which I get that argument, but, like, that is not impossible. So, Your Honor, here's what I'm going to say, and I love your questions. I'm enjoying this very much. This is the first time I'm here in 45 years practicing law. So what I want to say is, if you accept this argument from Mr. Rubin, this fantastically wealthy, business-savvy Russian investor, then what he's doing is he is being complicit as a co-conspirator in bank fraud. Yeah, I get that, but you don't actually make the argument that the contract wasn't valid as a matter of public policy or something. I get you. Who would have made that argument? I mean, you could have said the whole contract was not valid because it was the contract to perpetrate a fraud, but do you argue that that's a ground by which we should vacate the award? Well, Your Honor, I'm saying that Mr. Rubin does not have clean hands, and for Mr. Rubin, with unclean hands, to say, oh, I was defrauding. You lost the battle. I mean, I frame this to help you. You lost the battle at trial. So you made this argument about unclean hands. You made the argument sort of about fraud, but Judge Marrero was there. He was able to assess the credibility of each of the witnesses, including your client, and determined that the person who you're accusing in front of us of engaging in a fraud or being complicit and having unclean hands is actually telling the truth. So how do we undo that? You undo that by looking at the memorandum of understanding that was written by Rubin's people, that Rubin directed his people to sign, and you see that this 15-page memorandum of understanding doesn't say, oh, we have an oral contract someplace. It says this is our understanding. Now, remember, at the trial, Mr. Rubin testified that sometimes on these Russian deals, he does oral contracts, but he does protocols, does protocols. And he was asked, well, what are protocols? And he said protocols are memos of understanding in regard to the agreement. So here we have a memo of understanding with respect to the agreement. And the district court completely ignored it, even though it was written by the plaintiff's people, and Mr. Rubin directed his associate to sign the memorandum of understanding. So I'm asking you to look at the totality of the facts and circumstances, look at all of the evidence in this case, and recognize that it's impossible, Your Honors, to determine that the memorandum of understanding, let's not look at it, even though it was prepared by the plaintiff. The subscription agreement that had all the caveats you would expect to have in such a high-risk investment was there. Let's remember, we're talking about investing $25 million in a Russian poultry project in the vicinity of the Ural Mountains and the Volga River. And the investor is a highly sophisticated investor. He can't just say, oh, I listened to something that Mr. Danilov said, and I'm entitled to reasonably rely upon that. Doesn't your description of the investment as being ridiculous support the district court's conclusion that that wasn't the real contract? No, that was what happened. There was an investment on the part of Bloomfield in this Russian poultry project. Why? Because the Rubin brothers have attained unimaginable wealth because they are big-time risk-takers. They make billions by taking risks. They're not investing in Microsoft. They're not buying CDs. They're not buying U.S. Treasury bonds. The poultry project looked like a moneymaker, you're saying. I'm sorry, Your Honor? The poultry project looked like a moneymaker. Yes, yes. That is a project that could have resulted in the Rubin brothers making tenfold or twentyfold on their investment. This was a real investment. This was a real project. And these are very savvy businessmen who have made hundreds of millions and billions of dollars daring to tread where few have been willing to go. But what I'm saying now, and I want to be clear about this, is that they are held to a higher standard, Your Honors. When we're talking about fraud, you have to recognize these are multi-billionaires with a battery of barristers. And I use the word barristers because they're based in London. Financial advisors up the wazoo. And for them to say, oh, I was fraudulently induced, I reasonably relied upon something that Mr. Danilov said, is ridiculous. It's preposterous. Can I ask about the punitive damages? So you invoke this principle that for punitive damages there needs to be conduct aimed at the public generally. Yes. Does that – isn't it enough if it's an investor with whom you don't have a preexisting relationship? So if you're seeking out investors, you are engaging in conduct aimed at the public generally? Even if it's a specific transaction, it doesn't have to be like you go out on TV or something. It just has to be that there's no preexisting relationship. And wasn't that met here? It was absolutely not met here, Your Honor, because, first of all, there were no false SEC filings. There were no false promotional materials. There was no sugarcoating of the high risk and inherent danger with respect to investing in this project in a remote section of Russia. Everything was laid out. And the Ribbon Brothers said, let's go for it because we see opportunity. We see dollar signs. I have nothing against billionaires. I would love to be one myself. But you can't say, oh, I was told something by Elliot, I believed it, and now I have a ground to sue on the basis of fraudulent inducement without looking into anything and without reading the subscription agreement. And that's exactly how Rubin testified. He said, I didn't look at this agreement. I'm just looking at it now for the first time, but I decided to take the risk. Now, if he decided to take the risk and he knows everything there is to be known about what was going on in Russia 10 years ago, it cannot be fairly said that he was fraudulently induced. And all I want is fairness. That's all I request. You reserve two minutes of rebuttal. Thank you so much. Good morning, Your Honors. Stephen Cooper from Reed Smith for the Appley Bloomfield Investment. As has been noted in the argument already, Judge Marrero wrote an 81-page fact-based decision here. It was comprehensive. It was supported. It was well-reasoned. If you listen to the argument from the appellant, you would think there was one document that was at issue, the MOU, which I'll get to in a second. There were actually, and I counted them, almost 50 different pieces of documentary evidence that the judge relied on in his decision to support his findings. Additionally, he went out of his way to make a distinction between the credibility of Mr. Danilov and Mr. Rubin. The judge took the unusual steps of devoting three pages to Mr. Danilov's credibility. He found them unpersuasive. He found that he did not remember key details and that his testimony was inconsistent. I don't have to tell this Court that with regard to a civil action like this, there has to be clear error, not that Mr. Danilov's counsel would like it a different way or he sees it differently or he's angry, as he said. That's not the standard. The standard is, was there clear error? And in particular, with regard to credibility, the standard is very high. There has to be strong deference to the trial judge and virtually never clear error when there's a credibility determination. Now, Elliot Danilov was their case. He was the only witness, essentially. They don't cite the other two minor witnesses that they put up. He was shown numerous documents, and he was cross-examined, and his credibility was not there. We had David Rubin, Mehmet Saddam, Arkady Orkin, and Mr. Bendersky, all of whom had consistent stories. There were no credibility issues with regard to them. There was sort of a prior relationship. I mean, through intermediaries who knew each other. Can you talk a little bit about that? Sure. Sure, there was. There was no long-term contractual relationship under any stretch of the imagination. I mean, this relationship started in July. I think that's the word contractual. Yes, right, right. The relationship that gave the element of trust that went to the reliance factor was that Mr. Rubin had worked with Arkady Orkin. Arkady Orkin's son-in-law, Mr. Bendersky, was very good friends with Elliot Danilov. And, in fact, they had been at their weddings, and they had celebrated birthdays over the years. They were very close. They lived near each other in Brooklyn. And Mr. Orkin initially brought this deal to Mr. Rubin and said, you know, I think you should look at this. This is a guy who we like. He's part of our world. And Mr. Rubin, who has operated and, yes, has made billions of dollars, has done it based on assessing credibility, assessing people, you know, checking them out. He works largely on handshakes, and he has succeeded doing it. So he, yes, had an element of trust here because Mr. Bendersky and Mr. Orkin knew Mr. Danilov. And he himself, Mr. Rubin initially actually liked Mr. Danilov. And the reason we were here was to know that there wasn't a contractual relationship or long-term, it's because of the question about conduct directed to the public generally that I asked before. Yeah, on the punitive issue. This qualifies as conduct directed to the public generally because it wasn't part of a long-term contractual relationship. It was inviting an investor. Is that correct? I think there's three answers to that.  Which is that the standard is with regard to a contract claim, which is this Rocanova case, which is a court of appeals case in New York, if there's a long-term contractual relationship and the punitive damages comes out of it, then you have to show public harm. There was no fraud claim in the Rocanova case. It had been dismissed. So that's point one. There's no long- So you're saying if there's just supplies to breach of contract claims. Supplies to, right, right. It says explicitly the other claims have been dismissed. That was all that was remaining. Then there is a line of cases, including cases they cite, like the Topps case, where the court says if there's a sufficient distinction between the breach of contract and the fraud, punitive damages do not need to be supported by public harm. If essentially you're talking about punitive damages in connection with a distinct fraud claim, then you don't need it. Okay? So you're saying the district court didn't need to establish conduct directed to the public generally. Correct. Because there was the fraudulent inducement claim. Correct. But if the fraudulent inducement was closely related to the breach of contract, then maybe you would need to establish that. You might. I guess my question is, is there a conduct addressed to the public generally in this case? There is. I mean- And what is that? This was a fraud in connection with this Synergy Hybrid Fund. Mr. Donilov had actually been censored by the SEC a few years before that for putting out false or insufficient financial statements. Plus, the judge said that he was overvaluing the fund, and there was at least one other investor in the fund. Plus- The district court didn't make these findings or rely on these factors. I mean, the district court didn't make these- You may be right, but we don't have the benefit of the district court's analysis as to public harm. He said that there was no public harm, but he also did cite the SEC violations, the overvaluation, and the tax issues. But after saying- After saying there's no public harm was required. Correct. Correct. But I think, you know, the Landenberg case, the Landenberg case that we rely on, is a case where they found public harm because there had been SEC violations. Is there a New York case? Is there a New York case that's in this context where a New York court said it didn't require a showing of public harm? Yeah, the cases we cite on this are the Landenberg case- No, that's a federal case. Is there a New York court case? Plymouth and Corbin. I have to double-check if they're New York. Those are the three we rely on. Plymouth and Corbin. And as I say, the Rockenova case, which they rely on, I think supports our position. Well, as you say, I mean, you distinguished Rockenova. In the context of a breach of contract claim, is there a case in the context of a fraudulent inducement claim? The cases we cite are federal cases on this particular point. But there's a- I guess my question is, so assuming that they needed to show conduct directed to the public generally, what would that show look like? Is it that the federal regulator, the SEC, came in and made a sanction, and so therefore there's some kind of public interest? Or is it enough that it's the public generally that he's inviting investors that he doesn't have a preexisting relationship with, even though it's not like he sent out a public call? Is that enough to show conduct directed to the public generally? What is the showing that would be required, assuming such a showing is required? My reading of the case is it's something beyond the harm to this particular individual party. It's something beyond that. It doesn't have to be necessarily the United States of America, every citizen, but it's some group of people outside of the parties to the litigation. And you're saying that that exists on this record because of the SEC sanctions? Yeah. He's already shown- And how does that show harm to other people? Well, he sold his shares to other investors here, and he was putting out- he didn't send these financial statements that were owed to his investors in accordance with the SEC rules. To go back to Judge Livingston's question, what do we do with the fact that Judge Marrero said you don't need to show public harm, right? And now we're getting into a colloquy about what public harm there is on the record. Is there a harmless error or not? What do we do with that categorical statement? I think the court can say, listen, not everything in a decision is necessarily linked up exactly, but I think the judge does make the point that this guy has a checkered past. He has imposed harm to others other than this party. And I think the court can say, one, public harm is not required here because these are very- And I'm happy to speak to very distinct- Because fraudulent inducement in connection with sort of a general contractual relationship is sufficiently different from breach of contract, as in Boko Nova? Yes. And in TOPS and other cases where it's the same. Let me just talk about that for one minute. These are actually very different claims. This is not a fraudulent inducement in that if you do X, then, you know, well, if somebody hears something that causes them to enter into a contract. That's not what this is. This is they had a loan agreement, $25 million, payable back in two to three years, 50 percent collateral, going to be reduced to 25 percent collateral. That was the deal. Mr. Rubin made it crystal clear he didn't want to invest in equity. That was the deal. Mr. Elliott Danilov says, you know what, you really should invest in my funds because of all the reasons you know. You know, Hydra Identity, Russian banks aren't going to give money, et cetera. Mr. Rubin wants this to succeed. He wants Russian banks to lend to Mr. Danilov. So he says, fine. Immediately, if you look at no other document, look at 997, December 22nd. The minute the money comes in, Mr. Danilov pays himself fees, pays himself commission, pays off debts, puts it in banks that were not authorized. Prior to that, there's a whole line of agreement. So that's not a fraudulent inducement into the original agreement because there already was an original agreement. Right. It's a fraudulent inducement into how they performed the original agreement? Yes. Or it's really a separate fraud because if you look at it, the whole concept behind putting the money in the fund was that he would get control of it, and he wasn't supposed to get control of it. It's a separate fraud because you're saying they have the original agreement. Right. And he's breaching that by spending the money or whatever. Right. And there's a separate fraud that says put it in this account for this reason, and that was fraudulent. Right. The whole fraud was because he had – It's not really a fraudulent inducement. It's really not. It's really not. I mean, you know, it's really a separate fraud. Is it related? Yeah, it's related because it was part of similar conversations. But it's really a separate fraud. So if it is a fraud that comes out in the course of performing the contract, isn't that the kind of fraud that is closely related to a breach of contract? Well, it's not the concept of, well, it has the same basic facts. I mean, you really have to look at whether you're trying to convert a breach of contract claim into a fraud claim, and then it would be inappropriate. These are wholly separate series of events. I mean, yes, they're related, but there's nothing about the fund that's at all required when it comes to the basic contract. I mean, it really has no purpose. There's no need for it. There's no discussion. You're almost moving away from the argument that the post-oral agreement issues are collateral. No. I'm saying if it's not separate, it's highly collateral. They're not inconsistent. It's separable. They're distinct. They're collateral. They're separate. They're independent. I'm not saying they're unrelated. Mr. Carter, you conceived of it as fraudulent inducement as opposed to what you're saying here, which is just fraud. The fraudulent inducement was getting Mr. Rubin to invest in his fund. That's what it was. Not really getting him to make the loan. He was willing to make the loan. It was making that a component of the deal and inducing him to invest that. That's what it was. You said you were going to address the memorandum of understanding very briefly. Yeah. Well, counsel in his brief had in his argument said the judge ignored it. He didn't ignore it. I mean, the judge said actually he dealt with it and said it actually supported our position. It supported our position because it calls for, and it's page 63 of his decision, the MOU that was signed by the parties in or before September 2011 also provided that Rubin would control the money he was supposed to provide to UMG, despite the MOU referring to it as an investment. There were a number of things in there that indicated that it was a loan. Also, he was supposed to be, Mr. Rubin was supposed to be paid $25 million. You don't get paid $25 million with an investment that's a guarantee. You just don't get that. And he noted that. None of these were redemptions. You know, there were also partial payments on the actual debt. It was originally 25. It was now 18.5. And that's because there were partial payments. But none of them were coordinated with any sort of a valuation of the fund, a dilution of the securities. Not at all. It was simply a repayment of an absolute number. So if we disagree with you on the punitive damages, what do we do? You cut a million dollars off of the award and you affirm the rest. You seem so unhappy about that. Yeah, I'm not going to, you know, go crazy over it. But, listen, I think I will say I do think there's a little blurriness around it. To be perfectly frank, I do think the arguments we're making are correct. There is a little blurriness. Could it be certified? So you would agree to certify that question? You could certify the question. I mean, I'm not sure it's necessary, but you could. I mean, it really is a question that is a little unclear. So I want to thank Mr. Cooper for his candor in recognizing that the million dollars in punitive damages should go. But he didn't quite say that. Just to defend him, I think he said it was blurry. That's where we are. So this is not a fraudulent inducement case, Your Honors. And I don't think Mr. Cooper is putting up a really big fight on this issue. And I want to say that when you look at it. But what about the idea that there was a separate fraud? So the thing that he was fraudulently induced to do was something that happened in the course of the performance to invest in, to send the money to the particular accounts and so on. That's a fraud that's separate from the contract, right? That would be a separate fraud, separate from the contract. And if that were pleaded and if that were the basis of the district court's million dollars in punitive damages, we would be talking about a different case. But that's not what happened. We have to deal with what was decided by the district court. But the court does talk about the fraudulent inducement as being, you know, post-agreement conduct, right? I mean, maybe he could have used better terminology or something, but isn't that the way the fraud was described? So I do not know of any material misrepresentation of present fact that Mr. Daniloff was alleged to have made because I don't believe he made any misrepresentation. And I certainly don't believe for one second that David Rubin relied upon anything my client said. David Rubin is a very sharp cookie. He didn't become a multisquillionaire by just believing whatever Tom, Dick, and Harry, who may be introduced to him, happens to say on a given Tuesday. And I strongly maintain that, number one, the court got it wrong with respect to finding that the subscription agreement wasn't the contract. The Memorandum of Understanding, which was written by Rubin's people, that refers to the protocol as an investment isn't really an investment and that this is really a loan even though there's no promissory note, there's no loan agreement. Your Honors, when you buy a car and you take out a loan, there's a ton of paperwork. When you hire a contractor to do home improvement work, there's a ton of paperwork with respect to making these payments. When you buy a house, when you buy a house, you have the promissory note. You have the mortgage. You have to sign papers all afternoon. And here we're talking about a $25 million investment. And, yes, I'm using the word investment because that's what it was. This was not a loan. The district court got it wrong. Both the judgment on fraudulent inducement with a million dollars punitive damages should be vacated by this court in the interest of justice. On the punitive damages issue, you heard your friend on the other side say that it's blurry, that that issue of when punitive damages are appropriate in connection with the public harm underlying issue is not clear as a matter of New York law. Do you agree with that or do you disagree with that? I agree that there was no public harm here, and I agree. But that's not my question. Do you agree that as a matter of New York law that that's not clear? No, I'm saying that under New York law, I believe there has to be a public harm. Under Rovanova. And there was no public harm, correct. So Rovanova is a breach of contract case. Is there a case that involves this assessment of public harm, a New York court case, that involves this assessment of public harm in the context of fraudulent inducement? Very good question, Your Honor. All your questions were great. I could not find anything in my research. Is that a flat arrest? I'm just so excited to be here. You know, I'm used to being in traffic court. Right, right. So to come here today, you've made my day and my whole weekend. Would you answer that question, then? Is there a case that you're familiar with in the context of fraudulent inducement? I could not find one in my research. But I verily maintain that we have a case where there was no public harm. There was a finding by the district court that there was no public harm. And it is my position that absent public harm, and based upon the fact that Mr. Rubin has to be held to a higher standard because he's a sophisticated investor to the sanction by the SEC, right? I'm sorry, Your Honor? The district court does make reference to the sanction by the SEC, right? That had nothing to do with this case. It had nothing to do with the Rubin brothers or their investment vehicle. And it was not a basis for Judge Marrero to make a finding of fraudulent inducement, nor was it a fraudulent inducement. And listen, this is the first time I've ever had an argument where my adversary has said, yeah, it's kind of blurry, I wouldn't be upset if you let go of the punitive damages. So I don't want to bid against myself here. I'm asking you to strike out the fraudulent inducement judgment and vacate the million dollars in punitive damages. I'm also asking you, honestly, to strike out the breach of contract because my position is when you look at the subscription agreement and the memorandum of understanding, you're not talking about some secret oral contract that was designed to defraud Russian banks. But if that's their position, then clearly Rubin was in peridolicto as a co-conspirator, and that gives him unclean hands, and he shouldn't be rewarded with damages, punitive damages based upon a fraudulent inducement claim. I want to thank you all very much.